**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **KEVIN BLANCETT,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No.  7:11-CV-00106-O (BF)** |
| | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration

("Commissioner") denying the claim of Kevin Blancett ("Plaintiff") for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief,

filed on December 11, 2011, and Defendant's Brief, filed on January 6, 2012. Plaintiff did not file

a reply brief. The Court reviewed the record in connection with the pleadings. For the following

reasons, the Court recommends that the District Court AFFIRM the final decision of the

Commissioner.

**Background**[1]

**Procedural History**

On June 23, 2006, Plaintiff filed his application for DIB alleging disability beginning August

24, 2004 because of chondromalatia putulla or putellofeuioral, leg and knee problems, and clinical

depression. (Tr. 12, 90-92, 112, 116.) Plaintiff's application was denied initially and again upon

reconsideration, and thus Plaintiff timely requested a hearing. (Tr. 54-59, 69.) A hearing was held on

---

[1] The following background facts are taken from the transcript of the administrative
proceedings, which is designated as "Tr."

May 30, 2008 before an administrative law judge ("ALJ"), whereby Plaintiff, represented by counsel, and a vocational expert ("VE") appeared and testified. (Tr. 26-52.) On September 24, 2009, the ALJ issued an unfavorable decision finding Plaintiff not disabled within the meaning of the Act. (Tr. 9-25.) Plaintiff requested review to the Appeals Council, but that request was denied on June 23, 2011. (Tr. 1-5, 8.) Thus, the ALJ's decision became the final decision of the Commissioner, from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on February 4, 1977, making him 31 years old at the time of the hearing. (Tr. 29.) Plaintiff graduated from high school and completed some college, but he did not receive any type of college degree. (Tr. 30.) According to the VE who testified at the hearing, Plaintiff has past work experience as a corrections officer, a psychiatric aide, a cashier checker, a seasonal warehouse worker, and a manager trainee at a convenience store. (Tr. 46-47.)

**Plaintiff's Relevant Medical Evidence[2]**

Regarding Plaintiff's physical impairments, his history of knee pain is well-documented in the medical records, and recognized by the ALJ. (*See* Tr. 15.) In 2004, Plaintiff saw Dr. Michael Sheen regarding his knee pain. (Tr. 174-217.) Additionally, in 2004 and 2005, Plaintiff went to the Texas Center for Joint Replacement and saw Dr. Richard Reitman for his knee pain. (Tr. 257-62.) It should be noted that Plaintiff weighs 420 pounds, and both doctors recommended weight loss to Plaintiff. (Tr. 178, 261, 263.) In 2006, Plaintiff presented to Dr. Braden Neiman complaining of pain in his neck. (Tr. 268-300.) Plaintiff stated that the pain starts in his neck and then radiates to his left

_____

[2] The Court notes that Plaintiff does not contest the ALJ's findings on his physical impairments. Thus, this Court will focus its discussion on the relevant medical evidence which consists of Plaintiff's mental impairments.

shoulder blade and left hand. (Tr. 269.) Dr. Neiman found that surgery was not necessary, and instead gave Plaintiff some anti-inflammatory medication. (Tr. 271.)

At the request of the Commissioner, Plaintiff presented to Dr. Arthur Joyce for a consultative psychological examination on April 24, 2006. (Tr. 263-67.) Dr. Joyce administered the following examinations: Wechsler Adult Intelligence Scale-III ("WAIS-III"), Wide Range Achievement Test-Revision 3 ("WRAT-3"), and Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). (Tr. 263.) Dr. Joyce noted that Plaintiff was anxious on arrival but was cooperative and motivated. (*Id.*) She noted that the results of the examinations were considered to be valid. (*Id.*) On the WAIS-III examination, Plaintiff scored in the average range of general intellectual functioning. (Tr. 264.) Dr. Joyce indicated that Plaintiff's true level of intelligence might be slightly higher than that measured on the exam because of some scaled score variations. (*Id.*) The doctor noted that the results of the WAIS-III indicated Plaintiff was "capable of success in a fairly wide range of vocational situations." (*Id.*) On the WRAT-3 exam, the doctor noted that Plaintiff's scores on reading and arithmetic were slightly below expectation, but that his spelling score was extremely low. (Tr. 264-65.)

The MMPI-2 results demonstrated that Plaintiff "may have been exaggerating or overstating the extent of his emotional problems." (Tr. 265.) The scales also indicated that Plaintiff had moderate to severe personal distress, which Plaintiff indicated was exacerbated by his fiancé being sick with breast cancer and only given a few months left to live. (Tr. 265-66.) The doctor agreed that Plaintiff's anxiety, depression, worry, and anhedonia might not be a long-term emotional condition, but instead related to his fiancé's medical prognosis that she is terminally ill. (Tr. 265.) Dr. Joyce noted that Plaintiff had concentration and attention difficulties, impaired judgment, and trouble with his memory. (*Id.*) She made the notation that Plaintiff was insecure and distrustful of others, but he

3

appeared at ease in casual, social situations. (*Id.*) The doctor noted that Plaintiff was having trouble sleeping and he may benefit from prescription medication for both his sleep and his mood. (*Id.*) Dr. Joyce diagnosed Plaintiff with depressive disorder, not otherwise specified; and rule out major depression, attention-deficit disorder, disorder of written expression, and personality disorder. (Tr. 266.) Dr. Joyce assigned Plaintiff a GAF score of 60.[3] (*Id.*) She noted that Plaintiff was experiencing depression which would impair his concentration, attendance, and effectiveness in the workplace, thus impairing his ability to obtain and maintain employment. (*Id.*) She recommended that Plaintiff continue taking Effexor XR and that he try cognitive-behavioral counseling. (*Id.*) She further noted that Plaintiff had the intellectual and academic ability to be effective in many different occupations. (*Id.*) Dr. Joyce noted that Plaintiff had the ability to train in programs as well. (*Id.*) The doctor's "vocational prognosis for eventual employment in an appropriate capacity is fair to, possibly, favorable." (Tr. 267.)

Plaintiff sought mental health treatment, after his consultative examination, from Dr. Adam Butera beginning July 11, 2006 through August 14, 2008. (Tr. 316.) At his initial psychiatric evaluation on July 11, 2006, Plaintiff was diagnosed with bipolar disorder, not otherwise specified; panic disorder; pain disorder; and rule out obstructive sleep apnea. (Tr. 363-65.) Plaintiff reported feelings of anxiety, a depressed mood, decreased interest, and restless sleep. (Tr. 363.) Plaintiff also described having episodes of an elevated, hyper, excited, and irritable mood. (*Id.*) However, the doctor noted that Plaintiff did not exhibit any signs or symptoms of mania or hypomania during the evaluation. (*Id.*) The doctor indicated that Plaintiff had no prior psychiatric hospitalizations, and no

---

[3]A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See id.*

past suicide attempts or any intent or plans to commit suicide. (*Id.*) Dr. Butera noted that Plaintiff was well dressed and well groomed; he had psychomotor retardation, but no involuntary movements; his speech and language were normal; his mood was "depressed and anxious"; his affect was congruent and appropriate; he denied suicidal or homicidal ideation; his insight and judgment were intact; and he had no disorders of thought form or content. (Tr. 364.) The doctor continued Plaintiff on Effexor XR and prescribed him Lamictal. (Tr. 364-65.) Plaintiff was assigned a GAF score of 50.[4] (Tr. 364.)

Plaintiff returned to Dr. Butera's office on August 22, 2006, and reported his mood as "good" with no feelings of depression, decreased interest, or anhedonia. (Tr. 341.) Plaintiff also reported that he was sleeping better, his anxiety was under better control, and he denied any suicidal or homicidal ideation. (*Id.*) The doctor noted that Plaintiff did not exhibit any signs or symptoms of mania or hypomania. (*Id.*) He further indicated that Plaintiff was well dressed and well groomed; he had no psychomotor agitation, retardation, or involuntary movements; his speech and language were normal; his mood was "good"; his affect was congruent and appropriate; his insight and judgment were intact; and he had no disorders of thought form or content. (*Id.*) Dr. Butera's initial diagnoses remained the same. (*Id.*) He continued Plaintiff on Effexor XR and Lamictal, and advised Plaintiff to take vitamin B12. (*Id.*)

Plaintiff presented to Dr. Butera on November 20, 2006 and stated "[t]hat Lamictal works great. My mood is a lot better than it was before, and the vitamin B12 definitely helps with my energy." (Tr. 337.) At the examination, Plaintiff denied any feelings of depression, decreased interest, or anhedonia. (*Id.*) Dr. Butera noted that Plaintiff did not exhibit any signs or symptoms of mania or

---

[4] A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM).

hypomania. (*Id.*) The doctor made notations that Plaintiff was well dressed and well groomed; he had

no psychomotor agitation, retardation, or involuntary movements; his speech and language were

normal; his mood was "good"; his affect was congruent and appropriate; he denied any suicidal or

homicidal ideation; his insight and judgment were intact; and he had no disorders of thought form

or content. (*Id.*)

On February 12, 2007, Plaintiff visited with Dr. Butera and told him that his anxiety was

under control and that he was sleeping well. (Tr. 325.) Plaintiff denied depression, decreased interest,

or anhedonia. (*Id.*) The doctor indicated that Plaintiff did not exhibit any signs or symptoms of mania

or hypomania. (*Id.*) The doctor noted that Plaintiff was well dressed and well groomed, he had no

psychomotor agitation, his mood was good, his affect was congruent and appropriate, he had no

suicidal or homicidal ideation, and his insight and judgment were intact. (*Id.*) Plaintiff was assessed

with bipolar disorder, not otherwise specified; panic disorder; and pain disorder. (*Id.*)

On March 1, 2007, Plaintiff and his fiancé attended a counseling session with Dr. Butera. (Tr.

329.) The doctor noted that Plaintiff's mood was pleasant with a full affect and that he was pleasant

throughout the session and had good rapport. (*Id.*) Dr. Butera also made notations that Plaintiff was

alert and oriented, his speech was clear and his thoughts were goal-oriented, he had no unusual

agitation, he was well dressed and well groomed, and he denied suicidal or homicidal ideation. (*Id.*)

The doctor made the same notations on November 8, 2006 (Tr. 339); November 15, 2006 (Tr. 338);

December 6, 2006 (Tr. 336); January 3, 2007 (Tr. 335); February 1, 2007 (Tr. 334); February 15,

2007 (Tr. 330); June 28, 2007 (Tr. 425) (the doctor also noted that Plaintiff's "mood was noticeably

improved and he was using a lot more humor during th[e] session"); July 12, 2007 (Tr. 424) (the

doctor also indicated that Plaintiff "was in a fairly jovial mood today"); July 27, 2007 (Tr. 423); August 9, 2007 (Tr. 422); August 22, 2007 (Tr. 421); and September 10, 2007 (Tr. 420).

On May 9, 2007, Plaintiff had a counseling session with Dr. Butera and Plaintiff's mother. (Tr. 324.) The doctor noted that Plaintiff was mildly depressed with a congruent affect. (*Id.*) He also made the notation that Plaintiff was well groomed and dressed appropriately, his speech was clear and his thoughts were goal-oriented, he denied suicidal or homicidal ideation, and he was pleasant throughout the session and their rapport was good. (*Id.*) Dr. Butera assessed Plaintiff with bipolar disorder, panic disorder, pain disorder, and post-traumatic stress disorder. (*Id.*) The doctor made the same notations on June 15, 2007 with the addition that Plaintiff had no unusual agitation. (Tr. 426.) Plaintiff reported feeling anxious on June 15, 2007. (*Id.*)

Plaintiff had another counseling session with Dr. Butera on July 19, 2007. (Tr. 427-28.) He denied feelings of depression, decreased interest, or anhedonia. (Tr. 427.) Further, he denied any suicidal or homicidal ideation. (*Id.*) The doctor noted that Plaintiff did not exhibit any signs or symptoms of mania or hypomania. (*Id.*) Dr. Butera described Plaintiff's mood as "good", he had no unusual agitation or involuntary movements, he was well dressed and well groomed, his speech and language were normal, his insight and judgment were intact, and his thought content and form were proper. (*Id.*) Dr. Butera advised Plaintiff to return in four months. (Tr. 428.)

Plaintiff returned to Dr. Butera's office on October 2, 2007. (Tr. 419.) Plaintiff reported his mood as "upset, pissed-off, and depressed." (*Id.*) The doctor noted that Plaintiff was alert and oriented, he was pleasant and cooperative, he was well groomed, his speech was normal, he had no unusual agitation, he had no thought disorders or psychotic features, his affect was congruent to his mood, he denied suicidal or homicidal thoughts, his insight and judgment were intact, and he could

decipher right from wrong. (*Id.*) Dr. Butera's diagnoses remained the same and Plaintiff was continued on the same medications. (*Id.*)

Dr. Butera's notes from April 24, 2008 indicate that Plaintiff denied depression and suicidal or homicidal intent. (Tr. 418.) The doctor made notations that Plaintiff had no mania or hypomania and no psychosis. (*Id.*) Dr. Butera made the same notations on Plaintiff's last visit on August 14, 2008. (Tr. 417.) Plaintiff's diagnoses remained the same and he was continued on the same medications. (*Id.*)

Dr. Butera completed a Mental Impairment Questionnaire on February 28, 2007. (Tr. 350-55.) In the Questionnaire, he indicated that Plaintiff's response to treatment was fair to good and he diagnosed Plaintiff with panic disorder, bipolar disorder, and pain disorder. (Tr. 350.) He indicated Plaintiff's GAF score was 50 and his prognosis was good with continued services. (*Id.*) Regarding Plaintiff's mental abilities needed to do unskilled, semi-skilled and skilled work, the doctor indicated in many areas that Plaintiff would be "unable to meet competitive standards". (Tr. 352-53.) Regarding Plaintiff's functional limitations, Dr. Butera noted he had moderate restrictions in daily living activities and moderate difficulties in maintaining concentration, persistence, or pace; extreme difficulties in maintaining social functioning; and one or two episodes of decompensation in the last twelve months, each of which lasted for at least two weeks. (Tr. 353.) The doctor indicated that he thought Plaintiff would be absent from work more than four days per month. (Tr. 355.)

At the request of the Commissioner, a state agency psychological consultant, Dr. Leela Reddy, performed a Psychiatric Review Technique of Plaintiff on September 8, 2006. (Tr. 382-95.) In the Psychiatric Review Technique, Dr. Reddy diagnosed Plaintiff with 12.04 affective disorders, depression. (Tr. 382-85.) Under the medical disposition, the doctor marked that Plaintiff's depression

was not a severe impairment. (Tr. 382.) Regarding Plaintiff's functional limitations, Dr. Reddy indicated Plaintiff had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 392.) In the doctor's notes, she indicated that Plaintiff was alert and cooperative and his affect was appropriate with a normal mood that was not likely to change. (Tr. 394.) She noted that his thought processes were clear, goal-oriented, and that he did not have any delusions or hallucinations. (*Id*.) She made the notation that Plaintiff was of normal intelligence for his age and education level, and his concentration and memory were intact. (*Id*.) The doctor also indicated that the alleged limitations due to Plaintiff's mental impairments were not fully supported by the record. (*Id.)*

**Plaintiff's Testimony at the Hearing**

Plaintiff, represented by counsel, testified on his own behalf at the hearing held on May 30, 2008. (Tr. 26-52.) He testified regarding many different employment positions he held in the past, but his most significant position was that of a corrections officer. (Tr. 31-35.) He stated that he was a correctional officer for six years at the same institution and he had to go through training in order to become such an officer. (Tr. 30-32.) He left because he was having trouble walking due to cellulitis. (Tr. 32.) Plaintiff testified that during a typical day, he does some housework like laundry and washing dishes, and some work in the yard. (Tr. 35-36.) He testified that he lives in a three-bedroom house with his fiancé, he has two dogs, he has a computer that he uses for email and research, he has a driver's license and he drives about once every two days, and he is able to go to the store. (Tr. 36-37.) He stated he doesn't go to church and he very rarely visits with

people socially. (Tr. 37-38.) Plaintiff could not remember the last time he went to the emergency room or the hospital. (Tr. 38.)

Plaintiff stated that he is unable to work due to his pain. (Tr. 39.) He testified to experiencing pain in his hands, neck, shoulders, knees, feet, and legs. (*Id.*) Plaintiff testified that he takes pain medication which dulls the pain. (Tr. 39-40.) He stated that he has problems with headaches and swelling in his legs. (Tr. 40-41.) He testified that his weight fluctuates between 405 and 420 pounds. (Tr. 43.) Plaintiff testified that he sees a psychiatrist for his depression and bipolar disorder. (*Id.*) He stated that he has mood swings because of his bipolar disorder, but that he is taking medication that "helps a lot." (Tr. 44.) Plaintiff said that he only has trouble being around extremely large groups of people. (*Id.*)

**The Hearing**

A VE, Clifton King, Jr., also testified at the hearing regarding jobs in the national economy. He stated that Plaintiff has past relevant work as a corrections officer, a psychiatric aide, a cashier checker, a seasonal warehouse worker, and a manager trainee. (Tr. 46-47.) The ALJ posed a hypothetical to the VE: assume someone who can occasionally lift and carry, or push and pull, twenty pounds; frequently lift and carry, or push and pull, ten pounds; stand and walk for one hour at a time for no more than six hours in an eight-hour workday; sit up to six hours in an eight-hour workday; occasionally stoop, crouch, crawl, kneel and climb stairs or ramps; cannot climb ladders, ropes, or scaffolds; and cannot work at unprotected heights or around hazards. (Tr. 48.) She asked the VE if that hypothetical person, with the same age, education, and experience as Plaintiff, would be able to perform Plaintiff's past relevant work. (*Id.*) The VE indicated that hypothetical person would not. (*Id.*) The ALJ then asked if the hypothetical person could perform

10

any other jobs in the national economy. (*Id.*) The VE identified the following representative occupations: "food checker, sedentary, semi-skilled, SVP: 3" DOT[5] #211.482-014; "timekeeper, sedentary, semi-skilled, SVP: 3" DOT #215.362-022; and "appointment clerk, sedentary, semi-skilled, SVP: 3" DOT #237.367-010. (Tr. 48-49.)

Upon cross-examination, Plaintiff's counsel asked the VE to add the limitation that the hypothetical person could only have incidental contact with other workers, the public, and supervisors. (Tr. 49.) The VE responded that it would be very difficult to do the representative occupations. (*Id.*) Plaintiff's counsel asked the VE to add the limitation that the hypothetical person could not meet competitive standards regarding working in connection with others, completing a normal workday or workweek, performing at a consistent pace, accepting instructions, responding appropriately to criticism, getting along with co-workers, or dealing with normal work stress. (Tr. 49-50.) The VE replied that if a person is unable to meet competitive standards then they are unable to meet the standards of a job and thus could not work. (Tr. 50.) The VE also stated that a person who missed more than four days of work per month would not be able to maintain employment. (*Id.*) The VE testified that his testimony did not conflict with the provisions in the DOT. (Tr. 49.)

---

[5] The Dictionary of Occupational Titles ("DOT") is a standardized volume of job definitions that the Social Security Administration relies on at steps 4 and 5 of its five-step disability determination process.  SSR 00-4p, 2000 WL 1898704, at *2.

**The Decision**

The ALJ analyzed Plaintiff's claim pursuant to the familiar five-step sequential evaluation process.[6] However, before she evaluated the claim, she found that Plaintiff met the insured status requirements for DIB under the Act through December 31, 2009. (Tr. 15.) Then, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 24, 2004. (*Id.*) At step two, the ALJ found that the medical evidence established that Plaintiff had the following severe impairments: cervical disc disease and radiculitis, a history of bilateral patellar chondromalacia, and obesity. (*Id*.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.)

Before proceeding to step four, the ALJ assessed Plaintiff's RFC. She determined that he could perform a range of light work[7] in that he could occasionally lift and carry, or push and pull, twenty pounds; frequently lift and carry, or push and pull, ten pounds; stand and walk for one hour at a time for six hours in an eight-hour workday; sit for six hours in an eight-hour workday;

---

[6] (1) Is the claimant currently working? (2) Does he have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent him from performing his past relevant work? (5) Does the impairment prevent him from doing any other work? 20 C.F.R. §§ 404.1520, 416.920.

[7] Light work is defined as work that involves lifting no more than twenty pounds at a time with frequent lifting or carrying up to ten pounds. Even though the weight lifted may be very little, a job in this category requires a good deal of walking or standing, or it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full range of light work, an individual must have the ability to do substantially all of these abilities. 20 C.F.R. § 416.967.

occasionally stoop, crouch, kneel, crawl, and climb ramps or stairs, but could not climb ladders, ropes, or scaffolds; and could not work at unprotected heights or around hazards. (Tr. 20.)

At step four, the ALJ determined that Plaintiff could not perform his past relevant work. (Tr. 23.) At step five, the ALJ found, based on the testimony of the VE, that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 24-25.) Specifically, the ALJ found that Plaintiff could perform the positions of a food checker, a timekeeper, and an appointment clerk. (Tr. 25.) Hence, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act from his alleged onset date through the date of the ALJ's decision. (*Id.*)

### Standard of Review

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

13

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability.

*Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence,

14

retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

## Issues

1. Whether substantial evidence exists to support the ALJ's finding that Plaintiff's non-exertional impairments are not severe.

2. Whether the ALJ committed prejudicial legal error by failing to give Plaintiff's treating physician controlling weight.

## Analysis

**Whether substantial evidence exists to support the ALJ's finding that Plaintiff's non-exertional impairments are not severe.**

The ALJ determined that Plaintiff has the following severe impairments: cervical disc disease and radiculitis, a history of bilateral patellar chondromalacia, and obesity. Plaintiff contends that his bipolar disorder and depression should have been found to be severe impairments, and that the omission indicates the ALJ erred in her Step 2 determination and substantial evidence does not support her finding.

The ALJ found that although Plaintiff has medically-determinable impairments of bipolar disorder, not otherwise specified/depressive disorder, the impairments do "not pose more than any interference with the ability of the claimant to perform sustained work activity". (Tr. 16-17.) The ALJ further explained that Plaintiff's mental impairments, considered singly and in combination, "do not cause limitations in the claimant's ability to perform basic mental work activities and, therefore, are not 'severe'." (Tr. 19.) The ALJ also cited to *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), in her decision. (Tr. 17.)

In the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). The determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id.* at 1104. The Social Security Administration has additional regulations that govern the evaluation of the severity of a claimant's mental impairment. 20 C.F.R. § 404.1520a. The regulations require the ALJ to use a "special technique" that involves identifying each mental impairment specifically, rating the degree of functional limitation resulting from each impairment in four broad functional areas, and using those ratings to determine the severity of each impairment. *Id.* The regulations also require the ALJ to document her application of the special technique to the claimant's mental impairments. 20 C.F.R. § 404.1520a(e). Violation of a regulation constitutes reversible error and requires remand only when a reviewing court concludes that the error is not harmless. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

Here, neither party disputes that Plaintiff has acknowledged mental impairments of bipolar disorder and depressive disorder. Additionally, Plaintiff does not contend that the ALJ utilized the wrong standard of severity. Instead, Plaintiff asserts that his bipolar disorder and depressive disorder should have been found to be severe impairments; or in the alternative, at least considered in formulating Plaintiff's RFC. In support of Plaintiff's argument, he contends that Drs. Joyce and Butera found that Plaintiff's mental impairments would affect his ability to work, and that the medical records are replete with evidence of Plaintiff's depression. (Pl.'s Br. at 8.)

Regarding Dr. Joyce's assessment of Plaintiff's work-related abilities, this Court first points out that Dr. Joyce examined Plaintiff on April 24, 2006, before Plaintiff began seeing Dr. Butera and taking Lamictal. Dr. Joyce indicated that Plaintiff's depression would impair his concentration, attendance, and effectiveness in the workplace, thus debilitating his ability to obtain and maintain employment. However, in her examination, Dr. Joyce also opined, and Plaintiff agreed, that his depression might not be a long-term emotional condition, but was more related to his fiancé's medical prognosis. The doctor also noted that the results of the MMPI-2 test demonstrated that Plaintiff may have been exaggerating the extent of his emotional issues. While she diagnosed Plaintiff with a depressive disorder, she also ruled out major depression. The diagnosis of an impairment does not establish a disabling impairment or even a significant impact on that person's functional capacity. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (noting that the mere presence of some impairment is not disabling per se). The doctor did not diagnose Plaintiff with bipolar disorder. Dr. Joyce recommended prescription medication and counseling for Plaintiff. Finally, Dr. Joyce opined that her "vocational prognosis for [Plaintiff's] eventual employment in an appropriate capacity is fair to, possibly, favorable."

Plaintiff began seeing Dr. Butera in July of 2006, and he started taking a combination of Effexor XR, Lamictal, and vitamin B12. Plaintiff saw Dr. Butera for approximately two years, and over the course of those two years, Dr. Butera never diagnosed Plaintiff with a depressive disorder. Furthermore, Dr. Butera's records are replete with notations that Plaintiff's mood was good or pleasant and that Plaintiff had no feelings of depression, decreased interest, or anhedonia. Additionally, after just a few months, Plaintiff reported to the doctor "[t]hat Lamictal works great. My mood is a lot better than it was before, and the vitamin B12 definitely helps with my energy."

17

Plaintiff's argument that the medical records are replete with evidence of Plaintiff's depression fails. The bulk of the medical records regarding Plaintiff's mental impairments originated from Dr. Butera's office. Dr. Butera never found Plaintiff to have a depressive disorder and instead consistently indicated Plaintiff was in a good or pleasant mood.

Moreover, Plaintiff's contention that Drs. Joyce and Butera opined Plaintiff would have mental work-related impairments also fails. The opinion of Dr. Butera regarding Plaintiff's mental work-related abilities was given little weight by the ALJ because she found it inconsistent with the doctor's other records, as well as the medical evidence as a whole. (Tr. 23.) For reasons explained in greater detail below, the ALJ did not err by giving his opinion little weight. Additionally, while Dr. Joyce indicated Plaintiff may have some issues regarding his employment, the cause was his depression, which was clearly remedied by prescription medication and therapy with Dr. Butera. The Court notes that this was also precisely what Dr. Joyce recommended for Plaintiff. Furthermore, her ultimate vocational prognosis for Plaintiff was that eventual employment was fair and possibly even favorable. She opined that his depression was more of a temporary state and due to his fiancé's sickness. She also indicated that Plaintiff may have been exaggerating the extent of his emotional problems.

Additional evidence that Plaintiff's depression was not severe includes Plaintiff's own testimony at the hearing. Plaintiff did not describe any limitations that his depression caused him either in or out of the workplace, but instead said he was taking medication that helped a lot. In fact, the only mention of his depression was when he stated that he was seeing Dr. Butera for depression and his bipolar disorder. Plaintiff also testified that he does housework for a three-bedroom house, he works in the yard, he takes care of his terminally ill fiancé and two dogs, he

18

uses a computer for email and research, he has a driver's license, and he is able to drive himself to visit family or go to the store.

The ALJ found the opinion of Dr. Reddy, the state agency reviewing psychiatrist, consistent with the medical evidence, and thus accorded her opinion considerable weight. (Tr. 22.) The ALJ utilized the "special technique" that is outlined in 20 C.F.R. § 404.1520a, and documented her application of the technique, in finding that Plaintiff's depression and bipolar disorder were not severe impairments. To rate the degree of Plaintiff's functional limitations, the ALJ analyzed the four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c); 12.00C of the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1).

In activities of daily living, the ALJ found Plaintiff to have no more than "mild" restrictions. (Tr. 19.) The ALJ cited to Plaintiff's own testimony at the hearing regarding all of the daily activities that he is able to perform. (*Id.*) Regarding Plaintiff's social functioning, the ALJ determined that he had no more than "mild" limitations. (*Id.*) The ALJ stated that although Plaintiff has some difficulty with his mother and sister, he also takes care of his fiancé. (*Id.*) Furthermore, Plaintiff testified at the hearing that he is fine with being around other people, just as long as he is not in extremely large groups of people. The next functional area is concentration, persistence, or pace. The ALJ found that Plaintiff had "mild" limitations in this area because his activities demonstrated he had "adequate concentration and persistence". (Tr. 20.) Additionally, the Court points out that Plaintiff scored in the average range of general intellectual functioning on the WAIS-III examination, and Dr. Joyce found Plaintiff to have the intellectual and academic ability to be effective in many different occupations. In the last functional area, episodes of

19

decompensation, the ALJ determined that Plaintiff had no episodes of decompensation that lasted for an extended duration. (*Id.*) The ALJ reasoned that there is no evidence that Plaintiff needs a supportive environment or that he is unable to function outside of his home. (*Id.*) She also explained that he can cope with some change and an increase in mental demands. (*Id.*) The Court notes that the ALJ's findings on these four broad functional areas are consistent with the findings of Dr. Reddy in her Psychiatric Review Technique. Additionally, Dr. Reddy opined that Plaintiff's depression was not a severe impairment.

According to the regulations, if the degree of limitation in the first three functional areas is "none" or "mild" and the fourth functional area is "none", the ALJ will generally find that the mental impairment is not severe. *See* 20 C.F.R. § 404.1520a(d)(1). The only caveat is if the evidence otherwise demonstrates more than a minimal limitation in the Plaintiff's ability to perform basic work activities. *See id.; White v. Astrue,* No. 4:08–CV–415–Y, 2009 WL 763064, at *10 (N.D. Tex. Mar. 23, 2009). The Court finds that the evidence does not demonstrate more than minimal limitations in Plaintiff's work-related abilities. Thus, the ALJ did not err in her Step 2 determination and substantial evidence supports her findings.

Finally, Plaintiff's contention that the ALJ must consider non-severe limitations when formulating Plaintiff's RFC is accurate. *See* SSR 96-8p, 1996 WL 374184, at *5. However, Plaintiff's argument that the ALJ failed to consider his depression and bipolar disorder in assessing his RFC is without merit. In the ALJ's findings, she specifically stated that she considered the effects of all of the non-severe impairments when she considered the remaining steps. (Tr. 17.) She then went on to state that Plaintiff's depression and bipolar disorder did not meet the "B" or "C" criteria for a listed mental impairment and did not produce more than mild

limitations on Plaintiff's work-related abilities. (Tr. 20.) Thus, the impairments did not result in any work-related limitations that necessitated being a part of Plaintiff's RFC. (*Id.*) The ALJ is not required to incorporate limitations in the RFC that she did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir.1988).

In sum, substantial evidence supports the ALJ's finding that Plaintiff's bipolar disorder and depressive disorder were not "severe" impairments. The ALJ considered these non-severe impairments when formulating Plaintiff's RFC. The ALJ used the correct standard of severity and the "special technique" for mental impairments, and therefore made no errors of law in her Step 2 determination.

**Whether the ALJ committed prejudicial legal error by failing to give Plaintiff's treating physician controlling weight.**

Plaintiff contends that the ALJ failed to give proper weight to his treating physician's opinion. (Pl.'s Br. at 9-10.) The opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight in determining disability. A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). On the other hand "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). The ALJ must evaluate: the length, nature, and extent of the treatment relationship; the frequency of examination; the physician's supporting evidence; the level of consistency between the

physician's opinion and the record; the physician's specialization; and any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6).

Here, Plaintiff claims that the ALJ failed to show good cause as to why she did not give the opinion of Plaintiff's treating psychiatrist, Dr. Butera, controlling weight, and that such failure constitutes reversible error. (Pl.'s Br. at 10.) This Court disagrees.

In the ALJ's decision, she stated that she gave little weight to the opinion of Dr. Butera, contained in the Mental Impairment Questionnaire ("Questionnaire"), because it was inconsistent with Dr. Butera's contemporaneous treatment notes, a form completed by Dr. Butera concerning Plaintiff's application for long-term disability benefits, and the other evidence in the record. (Tr. 23.) The ALJ also listed the factors contained in 20 C.F.R. § 404.1527(d)(2)-(6) and noted that she considered these factors in weighing the medical opinions. (Tr. 22.)

First and foremost, the Court points out that the ALJ discounted the opinion of Dr. Butera contained in the Questionnaire due in large part to the opinion being inconsistent with his own contemporaneous treatment notes. Dr. Butera completed the Questionnaire on February 28, 2007. In the Questionnaire, Dr. Butera indicated that Plaintiff had moderate restrictions in daily living activities and moderate difficulties in maintaining concentration, persistence, or pace; extreme difficulties in maintaining social functioning; and one or two episodes of decompensation in the last twelve months, each of which lasted for at least two weeks. The doctor noted that he thought Plaintiff would be absent from work more than four days per month and that Plaintiff was unable to meet competitive standards in a variety of different mental ability areas required for skilled, semi-skilled, and unskilled employment.

Three months before Dr. Butera filled out the Questionnaire, Plaintiff had a counseling session with the doctor and he reported "[t]hat Lamictal works great. My mood is a lot better than it was before, and the vitamin B12 definitely helps with my energy." Plaintiff denied any feelings of depression, decreased interest, or anhedonia and the doctor indicated that Plaintiff did not exhibit any signs or symptoms of mania or hypomania. The doctor noted Plaintiff's mood as good and that nothing was unusual. During the time period from November 8, 2006 through March 1, 2007, the doctor made similar notations in his treatment notes. Dr. Butera's treatment notes dated November 8, 2006; November 15, 2006; December 6, 2006; January 3, 2007; February 1, 2007; February 15, 2007; and March 1, 2007, indicated that Plaintiff's mood was pleasant with a full affect and that he was pleasant throughout the session and had good rapport; he was alert and oriented; his speech was clear and his thoughts were goal-oriented; he had no unusual agitation; he was well dressed and well groomed; and he denied suicidal or homicidal ideation.

On February 12, 2007, only two weeks before the doctor filled out the Questionnaire, Plaintiff had a counseling session with Dr. Butera where he told him that his anxiety was under control and that he was sleeping well. Plaintiff denied any feelings of depression, decreased interest, or anhedonia. The doctor made notations that Plaintiff did not exhibit any signs or symptoms of mania or hypomania, he was well dressed and well groomed, he had no psychomotor agitation, his mood was good, his affect was congruent and appropriate, he had no suicidal or homicidal ideation, and his insight and judgment were intact.

Aside from Plaintiff's initial visit, Plaintiff only reported being depressed once on October 2, 2007; Plaintiff only reported being anxious once on June 15, 2007; and the doctor noted Plaintiff as mildly depressed twice on May 9, 2007 and June 15, 2007. Dr. Butera's treatment

notes over the course of two years consistently described Plaintiff as being in a good mood and

doing well with his medications. Plaintiff had frequent counseling sessions with the doctor and

Dr. Butera never indicated that he saw any signs or symptoms of mania or hypomania in Plaintiff.

Furthermore, the doctor never indicated that Plaintiff failed to show up for or missed an

appointment. Dr. Butera's treatment notes simply do not support his opinion provided in the

Questionnaire.

Additionally, the ALJ discounted Dr. Butera's opinion in the Questionnaire because it was

inconsistent with a form he completed in April of 2007 concerning Plaintiff's long-term disability

benefits. In the form, Dr. Butera indicated that Plaintiff's treatment consisted of medication

management and that his progress was improving. (Tr. 403.) An impairment that can be

controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability.

*See Johnson v. Bowen,* 864 F.2d 340, 348 (5th Cir. 1988). The doctor also marked on the form

that Plaintiff was not totally disabled from a mental standpoint. (*Id.*)

Finally, the ALJ gave little weight to Dr. Butera's opinion because it was not supported by

the overall evidence. First of all, his opinion was not consistent with the other medical evidence

in the record. As stated previously, Dr. Reddy only found mild limitations in Plaintiff's daily

living activities; maintaining social functioning; and maintaining concentration, persistence, or

pace. She also found no episodes of decompensation. For reasons previously explained, these

findings are consistent with the record evidence. Furthermore, it should be noted that Dr. Reddy's

opinion in the Psychiatric Review Technique was affirmed by Dr. Murray Lerner on January 11,

2007, after he reviewed all of the evidence in the file. (Tr. 396.) Additionally, Dr. Butera's

opinion was not consistent with that of Dr. Joyce's, who indicated that her "vocational prognosis

for eventual employment [for Plaintiff] in an appropriate capacity [wa]s fair to, possibly, favorable." She also noted that the MMPI-2 test results demonstrated that Plaintiff "may have been exaggerating or overstating the extent of his emotional problems." Dr. Joyce indicated that Plaintiff's depression may not be a long-term emotional condition and she ruled out major depression. Dr. Joyce also found that Plaintiff had the intellectual and academic ability to be effective in many different occupations.

Moreover, Dr. Butera's opinion was inconsistent with Plaintiff's own testimony at the hearing. Dr. Butera indicated that Plaintiff would have extreme difficulties in social functioning. However, Plaintiff testified at the hearing that he was fine around other people as long as he wasn't in extremely large groups of people. Dr. Butera also opined that Plaintiff would have moderate restrictions in his daily living activities. Nevertheless, Plaintiff testified to doing housework such as laundry and washing dishes; working in the yard; taking care of his fiancé, two dogs, and a three-bedroom house; using a computer; obtaining a driver's license; and driving to visit his family or to the store about once every two days. Furthermore, Plaintiff testified at the hearing that his medication was helping a lot for his bipolar disorder and depression. Plaintiff stated that the reason he couldn't work was because of the physical pain he experienced, not because of his mental impairments.

The Court finds that the ALJ properly rejected Dr. Butera's opinion with good cause. While the ALJ may not have specifically addressed each of the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6) in perfect narrative fashion, there was adequate consideration of the factors. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). The Court finds that the ALJ did not

commit prejudicial legal error and her decision to reject Dr. Butera's opinion is supported by substantial evidence.

### Recommendation

For the foregoing reasons, this Court recommends that the District Court AFFIRM the final decision of the Commissioner, as it is supported by substantial evidence and the Commissioner did not commit prejudicial legal error.

SO RECOMMENDED, August 27, 2012.


_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).